FIDELA RIVERA ET AL, demandantes y apelados, *v.* GREAT AMERICAN INDEMNITY CO. ET AL., demandados y apelantes. MATILDE COLÓN ET AL., demandantes y apelados, *v.* LOS MISMOS, demandados y apelantes. CELIA MALDONADO, demandante y apelada, *v.* LOS MISMOS, demandados y apelantes. VÍCTOR CAOLO LATRILLO, demandante y apelado, *v.* LOS MISMOS, demandados y apelantes. LUISA HERNÁNDEZ VDA. DE GARCÍA, demandante y apelada, *v.* LOS MISMOS, demandados y apelantes.

Núm. 10156.—*Sometidos:* Marzo 13, 1951. *Resueltos:* Marzo 20, 1952.

*Hugh R. Francis* y *Francis & Ydrach,* abogados de la apelante Great American Indemnity Co.; *Armando A. Miranda, Hugh R. Francis* y *Géigel & Silva,* abogados de los demás codemandados; *Francisco González, Jr., Orlando Antonsanti, Francisco Rebollo* y *René Benítez,* abogados de los apelados.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

El presente es un recurso de apelación interpuesto por la Great American Indemnity Company contra sentencias dictadas por la corte de distrito a favor de los demandantes en los casos del epígrafe por daños recibidos como resultado de un accidente de automóvil en que perecieron cinco personas y recibieron lesiones varias más. Las sentencias son de $7,500 en cada uno de tres casos y de $8,500 en dos casos

más—con un total de $39,500—y $5,000 para honorarios de abogado. Como los casos surgieron de los mismos hechos, fueron consolidados para juicio y resueltos con una sola relación de hechos y opinión. Dichos casos se han radicado y argumentado ante este Tribunal como una sola apelación.

Tenemos que resolver si la cláusula de cubierta automática de una póliza de seguros expedida por la Great American Indemnity Company a favor de Eduardo Flores cubría las dos guaguas propiedad de Rafael Guzmán y Calixto Contreras, respectivamente, las cuales fueron negligentemente manejadas causando con ello el accidente. Pero no puede enfocarse debidamente esta cuestión a menos que se haga una relación bastante detallada de ciertos hechos anteriores. (1)

En 1942 la Arundel Corporation, la Consolidated Engineering Company y la Hardway Contracting Company, a las cuales en adelante nos referiremos como la Arundel, otorgaron un contrato con la Marina para construir una base naval en Ensenada Honda, la cual más tarde se conoció como Roosevelt Roads. El área inmediata estaba escasamente habitada. Por consiguiente se hizo necesario buscar los medios para transportar de los pueblos limítrofes los miles de empleados que se requerían para este gigantesco proyecto.

El esfuerzo para suministrar tal transportación tuvo tres fases antes de que se resolviera finalmente el problema. Primeramente dueños individuales de camiones los transformaron en guaguas en las que transportaban los empleados al trabajo mediante paga directa de los empleados a los dueños. La Arundel, como contratista con la Marina, obtenía la gasolina, las gomas y las piezas que era imposible obtener sin

---

(1) Toda vez que el juez de distrito que vió este caso no estaba disponible para resolverlo, el mismo fué resuelto por otro juez por la transcripción de evidencia. Por tanto estamos en la misma posición que este último en lo que se refiere a la apreciación de la evidencia. Sin embargo, la mayor parte de los hechos están admitidos. Dondequiera que hay un conflicto substancial en la prueba relevante a nuestra decisión, indicamos nuestros puntos de vista sobre el mismo. Pero por razones obvias no hemos tratado de sintetizar la evidencia que consta de 2,429 páginas de estos voluminosos autos que consisten de quince piezas y de 3,246 páginas.

permisos de prioridad con motivo de la guerra y las vendía al costo a los dueños de las guaguas.

La segunda fase en la solución de este problema de transportación emanó del hecho de que la Arundel decidió que el sistema de contratar con los dueños individuales no era satisfactorio. A los ejecutivos de la Arundel se les hacía difícil entenderse con algunos de los dueños porque éstos no hablaban inglés; otros dueños obtenían gasolina y gomas de la Arundel y las usaban para fines ajenos a la transportación de empleados a la base. Con el fin de que la Arundel se entendiera con una sola persona, a los dueños individuales se les exigió que otorgaran un poder designando a Eduardo Flores como su representante para todos los asuntos relacionados con la transportación.

Flores, que había sido empleado en la oficina de Arundel, renunció. Éste explotaba una guagua de su propiedad como uno de los dueños individuales. También representaba a los otros dueños individuales como agente de éstos y, en general, procuraba que sus chóferes cumplieran con los reglamentos de Arundel, tales como la designación de guaguas para ciertas clases de empleados, la fijación de sitios para recoger los mismos, la velocidad a que debían manejarse las guaguas, etc. Por estos servicios cada dueño le pagaba a Flores $3 semanales. Los empleados pagaban su pasaje directamente a los dueños individuales según la tarifa fijada por la Arundel. Los dueños, como en el pasado, continuaron en vigor las pólizas de seguro de responsabilidad pública individualmente con la Great American Indemnity Company, por la suma de $5,000 para cada persona y de $10,000 para cada accidente, limitadas a la transportación de empleados de la Arundel a la base.

Esta segunda fase de la transportación todavía no era del agrado de la Arundel. Ésta decidió que el único método efectivo sería el que ella tuviera un contrato formal exclusivo de transportación con una sola persona responsable, que operara todas las guaguas como su línea de transporte y

quien, *como condición precedente a su derecho a transportar empleados, obtuviera un aumento en la cubierta del seguro que cubriera todas las guaguas por la suma de $10,000 para cada persona y $100,000 para un accidente.* Conforme a esto la Arundel otorgó un contrato con Flores, que fué firmado el 6 de abril de 1943. Ésta era la tercera y última fase en la evolución de la solución para este problema.

Durante abril de 1943 la forma en que se establecería una línea de transporte a ser operada exclusivamente por Flores, y no por los dueños individuales de las diferentes guaguas con Flores como su representante, estaba bajo discusión por los representantes de la Marina, la Arundel, Flores y la Great American Indemnity Insurance Company. Los oficiales de la Marina y de Arundel sugerían una póliza de flota de la clase usada frecuentemente para tales operaciones de servicio público en los Estados Unidos.[2] El representante de la compañía de seguros cuestionaba la legalidad de tal convenio en Puerto Rico. A su vez, proponía que la Compañía adicionara un endoso a la póliza original de Flores expedida a este último anteriormente como dueño individual, la cual por primera vez incluiría a la Arundel como asegurada, aumentaría la cubierta a $100,000 y añadiría una cláusula de cubierta automática para las otras guaguas que iban a formar parte de la línea a ser operada por Flores bajo el nuevo convenio. Los oficiales de la Marina y de Arundel fueron aún tan lejos como para sugerir que el contrato de transporte entre Flores y la Arundel fuera adherido al endoso, pero esto no se hizo porque el representante de la compañía creyó que eso no era lo que se hacía corrientemente. Estos oficiales también declararon que el representante de la compañía de seguros convino que durante el período en que se desarro-

---

[2] *Cf. Hawkeye Casualty Co.* v. *Halferty,* 131 F.2d 294 (C.A. 8, 1942); *Smith* v. *Republic Underwriters, Waco, Tex.,* 103 P.2d 858 (Kansas, 1940); *Dekat* v. *American Automobile Fire Ins. Co.,* 73 P.2d 1080 (Kansas, 1937); *Whitlock* v. *Individuals, etc.,* 6 P.2d 1088 (Oregon, 1932); *Ash-Grove L. & P. Cement Co.* v. *Southern Surety Co.,* 39 S.W.2d 434 (Missouri, 1931).

llaban estas discusiones, todas las guaguas utilizadas para el transporte de empleados estarían cubiertas mediante convenio oral (*oral binder*) proveyendo seguro de $10,000 para una persona y $100,000 para un accidente. La apelante niega esto, pero por motivos que más adelante veremos, es innecesario que resolvamos este conflicto en la evidencia.

Finalmente se llegó a un acuerdo en cuanto a los términos del endoso en la póliza de Flores conteniendo las condiciones antes mencionadas. A tenor con ello la compañía de seguros lo otorgó el 27 de abril de 1943 y lo remitió por correo a las oficinas de la Arundel, donde lo recibieron el 29 de abril, pocas horas después de ocurrido el accidente. En este momento conviene exponer brevemente los hechos del accidente que no están en controversia.

El 29 de abril de 1943 a las siete de la mañana una guagua propiedad de Isabelo Mercado estaba estacionada a la derecha de la carretera cuando otra guagua propiedad de Rafael Guzmán chocó con aquélla, resultando muertas cinco personas y lesionadas varias otras. La causa próxima del accidente fué el hecho de que el chófer de la guagua de Guzmán y el de una guagua propiedad de Calixto Contreras iban regateando a mayor velocidad. Las tres guaguas, que antes habían sido usadas durante algún tiempo para transportar empleados de la Arundel a la base, cumpliendo con las condiciones establecidas para la segunda fase antes descrita, estaban siendo usadas para el mismo fin cuando ocurrió el accidente.

La corte de distrito resolvió que el accidente se debió a la negligencia de los chóferes de las guaguas de Guzmán y de Contreras. Esta conclusión de hecho no ha sido impugnada por la compañía de seguros. La única controversia en este caso es si la cláusula de cubierta automática ascendente a $100,000 en la póliza de Flores cubría las guaguas de Guzmán y de Contreras a la fecha del accidente. Ochenta y una páginas del alegato de la apelante que consta de noventa y dos han sido dedicadas a discutir su contención de que la

cláusula no cubría estas dos guaguas. Aun cuando se levantan otras contenciones comparativamente de menos importancia, el caso de la apelante en substancia depende de esta proposición.

■ El endoso decía que la póliza de Flores se ampliaba para incluir a la Arundel, que se expedía en consideración de ciertas primas adicionales, y que el límite de responsabilidad se aumentaba a $10,000 para una persona y a $100,000 para un accidente. Finalizaba así:

"CUBIERTA AUTOMÁTICA: Si el asegurado arriba nombrado, dueño del automóvil, adquiere otro automóvil o alquila o toma en arrendamiento otro automóvil para usarlo a tenor con las disposiciones de las cláusulas de seguro núm. 1 y núm. 2 de esta póliza (Cubiertas para Lesiones Corporales y para Daños a la Propiedad), y así lo notifica a la Compañía dentro de diez (10) días siguientes a la fecha en que le sea entregado, el seguro que esta póliza confiere se aplica también a dicho otro automóvil a partir de la fecha de entrega, sujeto al pago de prima adicional o devolución de prima, según sea el caso:

"(a) Si sustituye un automóvil descrito en esta póliza, pero sólo hasta el límite en que el seguro sea aplicable al automóvil sustituído, o

"(b) Si es un automóvil adicional y si la compañía asegura todos los automóviles poseídos por el asegurado aquí mencionado en dicha fecha de entrega, pero sólo hasta el límite en que el seguro sea aplicable a todos los automóviles poseídos anteriormente."

La apelante sostiene primeramente que la cláusula antes copiada no cubría las guaguas de Guzmán y de Contreras por el fundamento de que éstas no fueron adquiridas con posterioridad a la fecha de efectividad del endoso—abril 27 de 1943—según lo exigía la cláusula en cuestión. Seguidamente convenimos que en el caso ordinario, bajo los términos de esta cláusula, que es corriente en contratos de seguro, un automóvil adquirido antes de la fecha de efectividad de tal disposición no está cubierto por el seguro. La teoría que encierra la cláusula es precisamente permitirle al asegurado

adquirir automóviles *después* de la fecha de efectividad de la póliza que en seguida a la entrega quedan cubiertos automáticamente por la póliza, siempre que el asegurado notifique a la compañía de dicha entrega dentro de diez días. En esta forma un asegurado que tiene en mente adquirir automóviles adicionales no tiene que demorar su compra o uso hasta que haya obtenido seguro para ellos. Por el contrario, los automóviles quedan asegurados inmediatamente que se los entregan al dueño. Éste tiene diez días para notificar a la compañía que los ha adquirido, pero la cubierta empieza en la fecha de la entrega. *Maryland Casualty Co.* v. *Toney*, 16 S.E.2d 340 (Va., 1941); *Clarno* v. *Gamble-Robinson Co.*, 251 N.W. 268 (Minn., 1933); *Aetna Casualty & Surety Co.* v. *Chapman*, 200 So. 425 (Ala., 1941); *Thompson* v. *State Automobile Mut. Ins. Co.*, 11 S.E.2d 849 (W.Va., 1940); *Commercial Standard Ins. Co.* v. *Central Produce Co.*, 42 F.Supp. 31 (Dist. Ct., Tenn., 1940).

■ Sin embargo, no creemos que esta disposición de la cláusula limitando su aplicación a automóviles adquiridos después, impide que se recobre bajo los hechos peculiares de este caso. En los casos en que descansa la apelante el asegurado adquirió los automóviles en la forma regular y corriente antes de que se escribiera la cláusula de cubierta automática. Pero debe recordarse que, en cuanto a Flores y a los dueños individuales, la forma de operación bajo la tercera y última fase no iba a ser materialmente cambiada *desde el punto de vista de estos últimos.* Es decir, ellos no iban a quedar fuera con motivo de la línea de transporte de Flores. Más bien, continuarían operando sus guaguas, empleando y pagando sus chóferes, obteniendo gasolina y piezas de la Arundel y cobrando directamente a los empleados ·el pasaje fijado por la Arundel. Las únicas diferencias substanciales eran (1) que cada uno de ellos pagaría a Flores una cantidad un poco más alta (no como su representante según se hacía en el pasado, sino por el privilegio de operar sus guaguas en el futuro bajo la égida de la línea de transporte

de Flores), y (2) que cada uno de ellos le reembolsaría a Flores las primas que éste viniera obligado a pagar a la compañía de seguro para que ésta incluyera sus automóviles bajo la cláusula de cubierta automática de la póliza de Flores. Algunos de los dueños estaban renuentes a entrar en este nuevo arreglo ya que el mismo envolvía un aumento considerable en su cubierta de seguro, la cual, en adición, estaría a nombre de Flores y no como en el pasado a nombre de ellos. Sin embargo, como se dieron cuenta de que ésta era la única forma en que se les permitiría continuar en este negocio, gradualmente fueron aceptando, si bien algunos de ellos no perfeccionaron sus arreglos con Flores hasta después de ocurrido el accidente.

No puede dudarse que, en lo que se refiere a todos los dueños individuales y a Flores, el día del accidente, el cambio de la fase segunda a la tercera no se había efectuado completamente. Pero eso no tiene nada que ver como cuestión de derecho sobre (1) el contrato de transporte del 6 de abril entre Flores y la Arundel y (2) el endoso, que fué un contrato entre la compañía aseguradora y Flores. Legalmente hablando, la Arundel nada tenía que ver en los arreglos que hizo Flores para obtener y operar las guaguas. Además, Flores venía obligado por su contrato con la Arundel a proporcionar el transporte, pero el contrato no empezaría a regir hasta que él asegurara en $100,000 las guaguas a usarse. En igual forma, a la compañía no le importaba el que a Flores, en virtud de algún convenio privado con los dueños individuales, se le reembolsaran o no las primas que él se obligó a pagar. Las únicas partes en el contrato de seguro fueron Flores, la Arundel y la compañía: los dueños individuales en ningún sitio fueron mencionados en el endoso y no tenían obligaciones o derechos bajo el mismo.

A la luz de estos hechos, nos parece obvio el siguiente razonamiento: El contrato de transporte bajo sus propios términos empezaba a regir cuando Flores obtuviera el seguro requerido en el mismo. El seguro fué expedido el 27 de abril

de 1943. Flores, frente a la Arundel, práctica y legalmente efectuó el cambio a la tercera fase de la transportación, simultánea o inmediatamente después de la expedición del endoso el 27 de abril. En tanto en cuanto concierne a Flores, toda vez que éste no tenía un contrato efectivo de transporte hasta dicha fecha, él no "arrendó" las guaguas pertenecientes a otros dueños, a los fines de su contrato de transporte, hasta esa fecha. Flores en consecuencia tenía diez días desde el 27 de abril para notificarle a la apelante que las guaguas de Guzmán y de Contreras estaban incluídas bajo la cláusula de cubierta automática. Este aviso se envió el 30 de abril dentro del período de diez días. Por tanto dichas dos guaguas estaban cubiertas por el endoso.

Nos damos cuenta de la interpretación algo especial que le damos al lenguaje de la cláusula de cubierta automática. Sin embargo, los autos nos convencen de que las partes tuvieron por miras el que la cláusula tuviera este significado. Creemos que la apelante, no obstante haber negado esto, a través de sus representantes estaba familiarizada completamente antes de que se expidiera el endoso con la forma peculiar en que se iba a operar la línea de transporte de Flores. Es muy significativo el que se incluyera a la Arundel por primera vez en la póliza como asegurada. Esto no es consistente con la posición asumida ahora por la apelante al efecto de que no estaba familiarizada con las circunstancias que mediaron en la creación de la línea de transporte de Flores, con el contrato de transporte ni con el verdadero propósito del endoso de abril 27. En verdad, aún después de ocurrido el accidente y la apelante haber investigado los hechos, aceptó primas para guaguas traídas posteriormente por Flores bajo el endoso, y en donde los hechos eran exactamente iguales a los de este caso.

Sobre esta cuestión, nos damos cuenta de que Flores, Guzmán y Contreras declararon que las guaguas en cuestión todavía no eran parte de la línea de transporte de Flores a la fecha del accidente, porque sus dueños todavía no habían con-

venido en reembolsar a Flores. Pero sobre este punto no damos crédito a su testimonio. O esta transacción complicada, técnica y legal estaba fuera del alcance del entendimiento de Flores, o éste declaraba falsamente para evitar responsabilidad personal o por algún otro motivo. Los oficiales de la Arundel y de la Marina y otros dueños de guaguas declararon en sentido contrario y—lo que es más importante—sus testimonios están sostenidos por la evidencia documental, v. g., el contrato de transporte del 7 de abril y los términos del endoso. Y esta evidencia oral y documental está reforzada por el hecho incontrovertido de que el 29 de abril—después de otorgarse el contrato de transporte dándole a Flores el privilegio exclusivo de transportar los empleados, y del endoso del 27 de abril cubriendo tal transportación—las guaguas aquí envueltas de hecho se dedicaban a la transportación de tales empleados.

No hemos pasado por alto el argumento de que no es probable que Flores hubiera permitido a cualquier guagua permanecer indefinidamente como parte de su línea de transporte, a menos que el dueño de la guagua hubiera convenido dentro de un tiempo razonable reembolsarle la prima adicional surgida al poner tal guagua bajo el endoso de la póliza de Flores. Es indudable que Flores hubiera tenido que resolver dicho problema con los dueños individuales poco después del 27 de abril. Pero esa cuestión nunca surgió porque los tres eventos vitales—la fecha de efectividad del contrato de transporte, el "arrendamiento" de los automóviles a ser usados en el cumplimiento del contrato, y el accidente—ocurrieron virtualmente al mismo tiempo. No podemos permitir que la compañía de seguro tome ventajas porque los hechos se desarrollaron en forma poco usual. Habiendo entrado en vigor el 27 de abril el contrato de transporte, y habiéndose usado las guaguas de Guzmán y de Contreras para cumplir con el mismo, dichas guaguas eran, bajo las circunstancias de este caso, "automóviles adquiridos después", dentro del significado de la cláusula de cubierta automática.

Las otras contenciones en relación a la cláusula de cubierta automática exigen poca consideración adicional. El argumento de que Flores no cumplió con el párrafo (*b*) de la cláusula que requiere que todos los automóviles del asegurado estén asegurados por la compañía es insostenible. Nada encontramos en los autos que nos convenza que Flores poseyera, adquiriera o arrendara para uso en su línea de transporte otros automóviles que no estaban asegurados por la apelante. *Cf. Home Mut. Ins. Co.* v. *Rose*, 150 F.2d 201 (C.A. 8, 1945); *Mitcham* v. *Travelers Indemnity Co.*, 127 F.2d 27 (C.A. 4, 1942); *Annotation*, 127 A.L.R. 486.

■ La próxima contención de la apelante es que los demandantes sólo pueden hacer valer aquellos derechos que Flores pudiera tener bajo el endoso, y que Flores está impedido de reclamar cubierta. Esta contención está basada en el testimonio del representante de la compañía aseguradora y de Flores al efecto de que poco antes del endoso de abril 27 Flores avisó al primero que no deseaba incluir ningún otro dueño individual bajo el endoso de su póliza, porque éstos no querían reembolsarle por las primas a ser pagadas por él. Por los motivos ya indicados, rechazamos este testimonio en vista de todas las circunstancias concurrentes en este caso. Por consiguiente, esta contención cae por su propio peso ya que no aceptamos el testimonio sobre el cual la misma se basa.

■ La apelante también arguye que el método de operar la línea de transporte de Flores bajo la fase tercera y última arriba descrita no constituía alquilar o arrendar automóviles para usarse según lo exigía la cláusula de cubierta automática. No vemos fin práctico en examinar las autoridades citadas por la apelante en cuanto a qué constituye "arrendar". Ya hemos visto que la apelante, tanto antes como después del accidente, estaba familiarizada perfectamente con la naturaleza de las operaciones de esta línea de guaguas. No puede ahora decir que el lenguaje mediante el cual convino en cubrir la situación, técnicamente significa otra cosa. Creemos que

bajo las circunstancias peculiares de este caso no es irrazonable interpretar el convenio que Flores tenía con los dueños individuales, como uno que envolvía el "arrendamiento" de sus automóviles para usarlos en el transporte de los empleados a la base, dentro del significado de la cláusula de cubierta automática.

Los otros errores señalados por la apelante o han sido cubiertos suficientemente por lo que ya se ha dicho, o son tan frívolos que no ameritan discusión. Resta indicar únicamente que no encontramos base para decir que la corte inferior abusó de su discreción al conceder $5,000 para honorarios de abogado. Sin embargo, bajo todas las circunstancias, no creemos que procede declarar con lugar la solicitud de los apelados para que se concedan honorarios adicionales ante este Tribunal.

*La sentencia de la corte de distrito será confirmada.*