# Staunton

## MARYLAND CASUALTY COMPANY v. CLIFTON TONEY, ET ALS.

### September 10, 1941.

### Record No. 2386.

Present, Campbell, C. J., and Holt, Hudgins, Gregory. Eggleston and Spratley, JJ.

The opinion states the case.

*C. E. Hunter* and *Showalter, Parsons, Kuyk & Staples,* for the plaintiff in error.

*Hale Collins* and *John T. Delaney,* for the defendants in error.

EGGLESTON, J., delivered the opinion of the court.

On February 17, 1939, Clifton Toney was struck and injured by a Dodge sedan owned by E. G. Kelley and driven by Carl Blankenship, his servant. Toney recovered a judgment against Kelley and Blankenship for damages for his injuries. Upon a suggestion of liability under an execution issued upon this judgment, garnishment process was served upon Maryland Casualty Company. Toney, the judgment creditor, claimed that the insurance company was liable to him by reason of an automobile liability policy which it had issued to Kelley. The insurance company, in its answer to the summons, denied that there was any liability upon it, asserting, among other things, that the automobile involved in the

accident was not covered by the terms of the policy. There was a trial before a jury which resulted in a verdict for the judgment creditor, on which final judgment was entered. A writ of error granted to the Maryland Casualty Company brings this judgment here for review.

On April 9, 1938, the Maryland Casualty Company issued an automobile liability policy to Kelley covering a 1937 Ford sedan for the period of one year from its date. The pertinent provisions of the policy will be set forth presently.

In January, 1939, Kelley decided to trade the Ford car covered by the policy for another automobile. He approached Henry E. Wood of Wood-Hammond Chevrolet Company of Clifton Forge, Virginia, to ascertain what allowance that company would make on the Ford automobile in exchange for a new 1939 Chevrolet car. Wood suggested a trade-in allowance which was not acceptable to Kelley, who replied that he had been offered a larger allowance for the Ford car by the Fulton Motor Company of Roanoke in exchange for a Dodge car. Wood then suggested that if Kelley would make such a trade with the Roanoke concern, he (Wood) would allow Kelley on the 1939 Chevrolet a larger amount for a Dodge car than he would for the Ford car.

On January 31, 1939, Kelley drove the Ford car to Roanoke and traded it to the Fulton Motor Company for a 1937 Dodge sedan. Each car was immediately delivered to the respective vendee. The certificate of title to the Ford car was assigned and transferred to the Fulton Motor Company and the certificate of title to the Dodge was assigned and transferred to Kelley. As a part of the consideration for the trade, Kelley gave the Fulton Motor Company his note for $200 secured by a lien on the Dodge car. This note the Fulton Motor Company transferred to the Commercial Credit Company which held the certificate of title to the Dodge showing the lien of $200 thereon. After this transaction was con-

summated Kelley drove the Dodge to Clifton Forge.

On the next day, February 1, Kelley began negotiations with Wood for the exchange of the Dodge car for a new 1939 Chevrolet. Satisfactory terms were agreed upon provided Wood's company could procure from the factory the special type of car which Kelley desired.

On February 4, Kelley signed a "Preferred Delivery Order" for the type of Chevrolet car which he wanted. As a part of the purchase price thereof Wood's company was to accept the Dodge car owned by Kelley and was to assume the $200 lien thereon held by the Commercial Credit Company. This instrument was not a contract of purchase and sale of the Chevrolet car but was merely an "order" therefor. It expressly provided, among other things, that it was subject to any change which the manufacturer might make in the price or design of the car pending delivery, and subject to the corresponding right of the purchaser to cancel the order if he was not satisfied with the increase in price. No attempt was made to transfer the title of the Dodge car to the Wood-Hammond Chevrolet Company.

According to Kelley's testimony, on February 13 he inquired of Wood as to when delivery of the new Chevrolet was expected. Wood replied that he could not obtain from the factory the special car which he (Kelley) had ordered and that "the deal would have to be called off." Thereupon Kelley canceled his order for the Chevrolet.

In the meantime the Dodge car had been delivered to the Wood-Hammond Chevrolet Company at the time the "Preferred Delivery Order" was executed, on February 4, and was housed in its garage. When Kelley's order for the Chevrolet was canceled the Dodge was returned to him. Pending the consummation of the trade and the expected purchase of the Chevrolet, Kelley was privileged to use the Dodge car which still carried the license plates placed thereon by him. Wood testified that during this time Kelley used the Dodge car, while Kelley's testimony is to the contrary.

On February 17 the accident occurred in which Toney was injured. On that day Kelley notified the local agent of the insurance company that he had acquired the Dodge car in place of the Ford car, and that the Dodge had been involved in the accident. The insurance company promptly denied liability and refused to defend the suit which Toney filed against Kelley and the driver of the car, Blankenship.

The rights of Toney, the judgment creditor, under the policy can, of course, rise no higher than those of Kelley, the insured. If Kelley is protected by the policy, then the judgment creditor is entitled to recover of the insurance company. If, on the other hand, Kelley, the insured, has no claim against the insurance company, his judgment creditor has none.

The policy provided: ''The purposes for which the automobile is to be used are pleasure and business, excluding the carrying of passengers for a consideration.''

It contained these further pertinent provisions: *''Automatic Insurance for Newly Acquired Automobiles.* If the named insured who is the owner of the automobile acquires ownership of another automobile, such insurance as is afforded by this policy applies also to such other automobile as of the date of its delivery to him, subject to the following additional conditions: * * * (2) if the company does not insure all automobiles owned by the named insured at the date of such delivery, insurance applies to such other automobile, if it replaces an automobile described in this policy and may be classified for the purpose of use stated in this policy, but only to the extent applicable to the replaced automobile; (3) the insurance afforded by this policy automatically terminates upon the replaced automobile at the date of such delivery; and (4) this agreement does not apply * * * (b) unless the named insured notifies the company within ten days following the date of delivery of such other automobile, * * * .''

The insurance company contends that in order that the insurance coverage provided in the policy might attach to the newly acquired Dodge car, the insured (Kelley) was required, under the "Automatic Insurance" provision above, to notify it within ten days of the delivery of the car to him, on January 31, of his acquisition thereof, and that since this notice had not been given within the required time, there was no liability on it for the judgment which Toney had recovered against the insured (Kelley).

The judgment creditor contends that there was no delivery of the Dodge car on January 31, within the meaning of the policy, because such delivery was for the purpose of trading that car to the Wood-Hammond Chevrolet Company, whereas, he says, the policy contemplates a physical delivery of the newly acquired car to the insured and an actual "placement" of it by him to the same use as that of the car described in the policy, and this "placement," he argues, did not occur until after the proposed deal for the Chevrolet had fallen through and the Dodge car had been returned by the Wood-Hammond Chevrolet Company to Kelley on February 13. Hence, he says, the required ten days notice was given within the proper time.

In our opinion the position of the judgment creditor cannot be maintained. His argument runs counter to the plain purpose and terms of the contract. The manifest purpose of the "Automatic Insurance" provision is to have the coverage attach to the newly acquired car at the earliest time the insured needs protection, provided he notifies the insurer within ten days of the commencement of such coverage.

The opening clause of the "Automatic Insurance" provision is as follows: "If the named insured who is the owner of the automobile acquires ownership of another automobile, such insurance as is afforded by this policy applies also to such other automobile as of the date of its delivery to him," subject to certain conditions to be here-

inafter noted. It will be observed that this clause is expressed in the broadest terms and is for the benefit of the insured. The policy provides coverage to the owner of the insured automobile whenever he ''acquires ownership of another automobile,'' and such insurance applies ''to such other automobile as of the date of its delivery to him.'' The insured is afforded protection from the earliest time he needs protection—that is, from the time the new car is delivered to him. Protection is not delayed until ownership is complete in the insured or until the title is registered in his name, or even until the newly acquired car is placed in service. From the time of the delivery of the car to the insured—that is, from the time he takes possession of it—he is protected by the policy.

But in order to afford the insured this protection certain ''additional conditions'' must obtain or be complied with. Under clause (2), if the company does not insure all of the automobiles owned by the insured ''at the date of such delivery,'' the insurance covering the car mentioned in the policy applies to the newly acquired automobile ''if it replaces an automobile described in this policy and may be classified for the purpose of use stated in this policy, but only to the extent applicable to the replaced automobile.'' Obviously this provision is for the benefit of the insurer. If the insurer does not carry a blanket policy on all automobiles owned by the insured, the newly acquired automobile must replace the car described in the policy and must be put to the same use. Otherwise the insurer might assume a greater hazard than was contemplated on the original car.

Under clause (3) ''the insurance afforded by this policy automatically terminates upon the replaced automobile at the date of such delivery.'' This provision is likewise for the benefit of the insurer and is inserted in order that it may not be held liable for risk incurred by the operation of the old car after coverage has applied to the newly acquired car.

Then follows another provision for the benefit of the insurer, namely, "(4) this agreement does not apply * * * (b) unless the named insured notifies the company within ten days following the date of delivery of such other automobile, * * * ."

It will be observed that the date of delivery of the newly acquired car is the pivotal date in each of these clauses. The insurance attaches to the newly acquired automobile "as of the date of its delivery" to the insured, and automatically terminates upon the old car "at the date of such delivery," provided the insured notifies the company within ten days following "the date of delivery of such other automobile" to him.

The argument of the judgment creditor that the time for notifying the insurance company did not commence to run until the proposed exchange of the Dodge car for a new Chevrolet had been called off, ignores the plain language of the policy that such notice must be given "within ten days following the date of delivery of such other automobile," and its manifest purpose to require such notice within the specified time of the commencement of the insurer's liability for the operation of the newly acquired car.

It is true that the policy limits the coverage of the newly acquired car to one which "replaces" the automobile described in the policy. But, as we have seen, the purpose of this latter clause is to limit the coverage on the newly acquired car to the "use stated in this policy" in order that the risk assumed on the new car may be the same as that carried on the old car.

The undisputed evidence is that the Dodge car was put to the same use as that specified in the policy for the Ford car, namely, "pleasure and business, excluding the carrying of passengers for a consideration." Thus, in its use it replaced the Ford car.

But even if we take the view that the automatic coverage provided by the policy attached on the date the Dodge car actually replaced the Ford car in Kelley's

service, and that the ten days notice must have been given with respect to that date, we think that such "replacement" occurred on January 31, subject to the fact that the Dodge car itself might have been replaced by a Chevrolet, if the deal between Kelley and the Wood-Hammond Chevrolet Company had been consummated.

Can it be doubted that if Kelley had had an accident on January 31, while returning from Roanoke to Clifton Forge with the newly acquired Dodge car, and had notified the insurance company thereof within the prescribed ten days, he would have been protected under the policy? We think not. Certainly all of the conditions for coverage obtained. Kelley, the "named insured," had acquired "ownership" of the Dodge car, and it was being put to the same use as that specified in the policy, that is, it was being driven for the "pleasure and business" of the insured.

In our opinion the policy protected Kelley, the insured, from the time the car was delivered to him at Roanoke, on January 31, until the expiration date of the policy, provided he had given the insurance company the required ten days notice.

The case at bar is clearly distinguishable from *Thompson* v. *State Automobile Mut. Ins. Co.* (W. Va.), 11 S. E. (2d) 849, so strongly relied on by the judgment creditor. There the insured held a policy which covered his fleet of commercial tank trucks. He purchased another truck which was not equipped so as to be put to the same use as the other trucks in the fleet. About sixty days later a tank was placed on the newly acquired truck and it was then substituted in the place of a worn-out truck and became a part of the fleet covered in the policy. Prior to this substitution the newly acquired truck had been used to a limited extent in "general hauling." Shortly after the new truck became a part of the tank car fleet it was involved in an accident.

It was held that the time for giving the required ten days notice under the automatic insurance provision in

the policy similar to the one before us, ran from the date the newly acquired truck was actually substituted as a part of insured's tank car fleet and not from the date of its original delivery to him.

But in that case until the body of the new truck had been changed and a tank had been installed thereon, it could not have been put to the same use as the other trucks covered in the policy and could not have replaced one of them. Indeed, it was actually put to a different use. Moreover, until the date of substitution, all of the trucks mentioned in the policy were in actual use and remained covered by the insurance. Hence, coverage under the policy did not attach to the new truck until the date of the substitution.

In the case at bar coverage on the Ford car, specified in the policy, had terminated. No change was required in the Dodge car in order that it might "replace" the Ford car. From the date of its delivery to Kelley, the Dodge car was fully equipped and ready to take the place of and be put to the same use as the Ford car, that is, to be driven for "pleasure and business."

It is true that from February 4 until February 13, Kelley hoped to trade the Dodge car to the Wood-Hammond Chevrolet Company. But this proposed deal was conditioned upon the delivery to Kelley of the special type of Chevrolet car which he desired, and when this car could not be obtained from the manufacturer the proposed trade was called off. In the meantime no change had been made in the status of the Dodge car. It was always owned by Kelley and was capable of being used by him in the same manner as the Ford which it replaced.

In the brief some mention is made of the fact that prior to the acquisition of the Dodge car, Kelley told the local agent of the insurance company that he (Kelley) "had a couple of deals" on the Ford car, and that the agent replied that he (Kelley) had ten days after the acquisition of the new car within which to transfer the

insurance to it. But there is no real contention that this was a sufficient notice to the insurance company. At the time of this conversation Kelley, of course, did not know what particular car he could acquire or whether he would be able to consummate his proposed "deals." Therefore, it was impossible for him to specify or describe the newly acquired automobile in order that the policy might be transferred to it.

Since, in our opinion, the prescribed ten days notice was not given by Kelley to the insurance company, as required by the policy, the insurance company was not liable for damages arising out of the accident in which the Dodge car was involved.

The judgment complained of will be set aside and a final judgment will be here entered for the Maryland Casualty Company, the garnishee and plaintiff in error.

*Reversed and final judgment.*