FIDELA RIVERA ET AL., Plaintiffs and Appellees, *v.* GREAT AMERICAN INDEMNITY CO., ET AL., Defendants and Appellants. MATILDE COLÓN ET AL., Plaintiffs and Appellees, *v.* THE SAME, Defendants and Appellants. CELIA MALDONADO, Plaintiff and Appellee, *v.* THE SAME, Defendants and Appellants. VÍCTOR CAOLO LATRILLO, Plaintiff and Appellee, *v.* THE SAME, Defendants and Appellants. LUISA HERNÁNDEZ WIDOW OF GARCÍA, Plaintiff and Appellee, *v.* THE SAME, Defendants and Appellants.

No. 10156.    Argued March 13, 1951.—Decided March 20, 1952.

---

224

*Hugh R. Francis* and *Francis & Ydrach* for Great American Indemnity Co., appellant. *Armando A. Miranda, Hugh R. Francis,* and *Géigel & Silva,* for others codefendants; *Francisco González, Jr., Orlando Antonsanti, Francisco Rebollo,* and *René Benítez,* for appellees.

MR. JUSTICE SNYDER delivered the opinion of the Court.

This is an appeal by Great American Indemnity Company from judgments of the district court in favor of the plaintiffs in the above-entitled suits for damages resulting from an automobile accident in which five persons were killed and several others were injured. The judgments are for $7,500 each in three cases and $8,500 each in two cases —making a total of $39,500—and $5,000 for attorney's fees. As the cases arose out of the same facts, they were consolidated for trial and disposed of by consolidated findings of fact and opinion. They have been briefed and argued in this Court as a single appeal.

We are required to decide if the automatic coverage clause of an insurance policy issued by Great American Indemnity Company in favor of Eduardo Flores covered the two buses owned by Rafael Guzmán and Calixto Contreras, respectively, which were negligently driven and thereby caused the accident. But this question cannot be brought properly into focus unless a fairly detailed statement is made of certain background facts.[1]

---

[1] As the district judge who tried this case was not available for decision thereof, it was decided by another judge on the basis of the transcript of the evidence. We are therefore in the same position as the latter insofar as weighing the evidence is concerned. However, most of the facts are undisputed. Wherever there is a substantial conflict in the testimony which is relevant to our decision we indicate our views thereon. But for obvious reasons we have not attempted to summarize the testimony which takes 2429 pages of this voluminous record consisting of fifteen volumes and of 3246 pages.

In 1942 Arundel Corporation, Consolidated Engineering Company and Hardway Contracting Company, hereinafter referred to as Arundel, entered into a contract with the Navy to construct a naval base and facilities at Ensenada Honda which subsequently became known as Roosevelt Roads. The immediate area was sparsely settled. It was therefore necessary to devise means to transport the thousands of employees required for this large project from neighboring towns.

The effort to furnish such transportation went through three phases before the problem was finally solved. In the first stage individual owners of trucks converted them into buses in which they brought the employees to work for fares paid directly by the employees to the bus owners. Arundel, as a Navy contractor, obtained gasoline, tires and parts which could not be procured without priorities due to the war and sold them at cost to the owners of the buses.

The second phase in the development of a solution for this problem of transportation resulted from the fact that Arundel found the system of dealing with individual owners unsatisfactory. It was difficult for executives of Arundel to deal with some of the owners because the latter did not speak English; other owners would obtain gasoline and tires from Arundel and then use them for purposes other than transportation of employees to the base. To enable Arundel to deal with one person, the individual owners were required to execute a power of attorney which named Eduardo Flores as their representative for all matters relating to the transportation.

Flores, who had been an office employee of Arundel, resigned. He operated a bus of his own as one of the individual owners. He also represented the individual owners as their agent and in general saw that their chauffeurs conformed to the requirements of Arundel such as designation of buses for certain classes of employees, fixing of places to

pick up passengers, speed at which buses would operate, etc. For his services Flores was paid $3.00 a week by each owner. The employees paid their fares directly to the individual owners at rates fixed by Arundel. The owners as in the past continued to carry individual public liability insurance policies with Great American Indemnity Company in the amount of $5,000 for one person and $10,000 for one accident limited to the transportation of Arundel employees to the base.

This second phase for handling the transportation was still not to the liking of Arundel. It concluded that the only effective method would be for it to have a formal exclusive contract of transportation with one responsible person who would operate all the buses as his transportation line and who *as a condition precedent to his right to transport employees would obtain increased insurance coverage in the amount of $10,000 for one person and $100,000 for one accident covering all the buses*. Accordingly, Arundel negotiated such a contract with Flores, which was signed on April 6, 1943. This was the third and final phase in the evolution of a solution for this problem.

During April of 1943 the mechanics of establishing the single transportation line to be operated solely by Flores, rather than by individual owners of the different buses with Flores as their representative, were under discussion by representatives of the Navy, Arundel, Flores and Great American Indemnity Insurance Company. The Navy and Arundel officials suggested a fleet policy of the type frequently used for such public utility operations in the States.[2] The representative of the insurance company questioned the

---

[2] *Cf. Hawkeye Casualty Co.* v. *Halferty*, 131 F. 2d 294 (C.C.A. 8, 1942) ; *Smith* v. *Republic Underwriters, Waco, Tex.*, 103 P. 2d 858 (Kansas, 1940) ; *Dekat* v. *American Automobile Fire Ins. Co.*, 73 P. 2d 1080 (Kansas, 1937) ; *Whitlock* v. *Individuals, Etc.*, 6 P. 2d 1088 (Oregon, 1932) ; *Ash-Grove L. & P. Cement Co.* v. *Southern Surety Co.*, 39 S. W. 2d 434 (Missouri, 1931).

legality of such an arrangement in Puerto Rico. Instead he proposed that the company execute an endorsement of the original Flores' policy previously issued to the latters as an individual owner, which would for the first time include Arundel as an assured, would increase coverage to $100,000 and would add an automatic coverage clause for the other buses which were to become a part of the bus line to be operated by Flores under the new arrangement. The Navy and Arundel officials even went so far as to suggest that the transportation contract between Flores and Arundel be attached to the endorsement, but this was not done because the company's representative thought it would be somewhat unusual. These officials also testified that the representative of the insurance company agreed that during the interim period while these discussions were being held all the buses being utilized for transportation of the employees would be covered by an oral binder providing for insurance of $10,000 for one person and $100,000 for an accident. The appellant denies this, but for reasons to be noted later it is unnecessary to resolve this conflict in the testimony.

Agreement was finally reached as to the terms of the endorsement on Flores' policy along the aforesaid lines. Accordingly, it was executed by the insurance company on April 27, 1943 and mailed to the offices of Arundel, where it was received on April 29, a few hours after the accident. At this point it is appropriate to state briefly the undisputed facts of the accident.

On April 29, 1943 at 7 a.m. a bus owned by Isabelo Mercado was parked on the right side of the road when a bus belonging to Rafael Guzmán collided with it, killing five passengers and injuring several others. The proximate cause of the accident was the fact that the drivers of the Guzmán bus and of a bus belonging to Calixto Contreras were racing each other at high speed. The three buses, which had previously been used for some time to transport employees of Arundel to

the base by complying with the conditions laid down for the above-described second phase, were being used for the same purpose when the accident occurred.

The district court found that the accident was caused by the negligence of the drivers of the Guzmán and Contreras buses. This finding of fact is not challenged by the insurance company. The only controversy here is whether the automatic coverage clause in the amount of $100,000 in Flores' policy covered the Guzmán and the Contreras buses on the date of the accident. Eighty-one pages of the appellant's ninety-two page brief are devoted to a discussion of its contention that the clause did not cover these two buses. Although other comparatively minor contentions are made, the case of the appellant in substance stands or falls on this proposition.

■ The endorsement recited that the Flores' policy was extended to include Arundel, that it was issued in consideration of certain additional premiums, and that the limit of liability was increased to $10,000 for one person and $100,000 for one accident. It concluded as follows:

"AUTOMATIC COVERAGE: If the named insured who is the owner of the automobile acquires ownership of another automobile or rents or hires another automobile for use in accordance with the provisions of Insurance Clauses No. 1 and 2 hereof (Bodily Injury and Property Damage Coverages), and so notifies the Company within ten (10) days following the date of its delivery to him, such insurance as is afforded by this policy applies also to such other automobile as of such delivery date, subject to additional or return premium, whichever be the case:

"(a) If it replaces an automobile described in this policy, but only to the extent the insurance is applicable to the replaced automobile, or

"(b) If it (sic) an additional automobile and if the company insures all automobiles owned by the named insured at such delivery date, but only to the extent the insurance is applicable to all such previously owned automobile. (sic)"

The appellant first contends that the quoted clause did not cover the Guzmán and Contreras buses on the ground that they were not acquired subsequent to the effective date of the endorsement—April 27, 1943—as required by the clause in question. We readily agree that in the ordinary case under the terms of this clause, which is standard in insurance contracts, a car acquired prior to the effective date of such a provision is not covered by it. The theory behind the clause is precisely to enable the insured to acquire cars *subsequent* to the effective date of the policy which thereby become insured automatically upon delivery, provided the insured notifies the company of the said delivery within ten days. In this way an insured who plans to acquire additional automobiles need not delay their purchase or use until he can obtain insurance for them. Instead, the cars are insured immediately upon delivery to him. He has ten days to notify the company that he has acquired them, but coverage attaches as of the date of delivery. *Maryland Casualty Co.* v. *Toney*, 16 S. E. 2d 340 (Va., 1941) ; *Clarno* v. *Gamble-Robinson Co.*, 251 N. W. 268 (Minn., 1933) ; *Aetna Casualty & Surety Co.* v. *Chapman*, 200 S. 425 (Ala., 1941) ; *Thompson* v. *State Automobile Mut. Ins. Co.*, 11 S. E. 2d 849 (W. Va., 1940) ; *Commercial Standard Ins. Co.* v. *Central Produce Co.*, 42 F. Supp. 31 (Dist. Ct., Tenn., 1940).

■ However, we cannot agree that this provision of the clause confining its application to after-acquired cars inhibits recovery under the peculiar facts of this case. In the cases relied on by the appellant the insured acquired cars in the regular and normal way before the automatic coverage clause was written. But it must be remembered that, as between Flores and the individual owners, the manner of operation under the third and final phase was not to be materially changed *from the point of view of the latter*. That is to say, they would not be ousted by the Flores transportation line. Rather they would continue to operate their

buses, hire and pay their chauffeurs, obtain gasoline and parts from Arundel and collect directly from the employees the fares fixed by Arundel. The only substantial differences were (1) that they would each pay Flores a slightly increased fee (not as their representative as in the past but for the privilege of operating their buses in the future under the aegis of the Flores transportation line), and (2) that each of them would have to reimburse Flores for the premiums the latter would obligate himself to pay to the insurance company for including their cars under the automatic coverage clause of the Flores' policy. Some of the owners were understandably reluctant to enter into this new arrangement, particularly as it involved a considerable increase in their insurance coverage which, moreover, would be in the name of Flores rather than as in the past in their names. However, as they became aware of the fact that this was the only method whereby they would be permitted to continue in this business, they gradually fell in line, although some of them did not perfect their arrangements with Flores until after the accident.

It cannot be gainsaid that, as between all the individual owners and Flores, on the date of the accident the changeover from the second to the third phase had not been completely effectuated. But that fact had no bearing as a matter of law on (1) the contract of transportation of April 6 between Flores and Arundel and (2) the endorsement, which was a contract between the insurance company and Flores. Arundel had no part, legally speaking, in the arrangements Flores made to obtain and operate buses. Moreover, Flores was bound by his contract with Arundel to furnish transportation, but the contract would not go into effect until he insured the buses to be used for $100,000. By the same token, it was no concern of the insurance company whether or not Flores, by some private arrangement with the individual owners, was reimbursed for the pre-

miums which he obligated himself to pay. The only parties to the contract of insurance were Flores, Arundel and the company: the individual owners were nowhere mentioned in the endorsement and had no obligations or rights under it.

In the light of these facts, the following reasoning seems obvious to us: The contract of transportation under its terms was to become operative when Flores obtained the insurance required therein. The insurance was issued on April 27, 1943. Flores, vis-a-vis Arundel, practically and legally effected the change-over to the third phase of transportation simultaneously or immediately subsequent to issuance of the endorsement on April 27. So far as Flores was concerned, since he had no effective contract of transportation until that date, Flores did not "hire" the buses belonging to the others, for purposes of his contract of transportation, until that date. Flores consequently had ten days from April 27 to notify the appellant that the Guzmán and Contreras buses were included under the automatic coverage clause. This notice was given on April 30, within the ten-day period. The said two buses were therefore covered by the endorsement.

We recognize the somewhat special interpretation which we are giving to the language of the automatic coverage clause. However, we are satisfied from the record that the parties intended for the clause to have this meaning. We think the appellant, despite its present disclaimer, through its representatives was thoroughly familiar before the endorsement was issued with the peculiar manner in which the Flores transportation line was to be operated. It is highly significant that Arundel was for the first time included in the policy as an assured. This is not consistent with the position now taken by the appellant that it was not familiar with the circumstances surrounding the creation of the Flores transportation line, the contract of transportation, and the real purpose of the endorsement of April

27. Indeed, even after the accident occurred and the appellant had investigated the facts, it accepted premiums for buses which Flores thereafter brought under his endorsement where the facts were exactly the same as they are here.

In this connection, we are aware that Flores, Guzmán and Contreras testified that the buses in question were not yet a part of the Flores transportation line on the date of the accident because their owners had not yet agreed to reimburse Flores. But we give no credence to their testimony on this point. Either this complicated, technical legal transaction was beyond Flores' understanding or he was testifying falsely to avoid personal liability or for some other purpose. The Arundel and Navy officials and other bus owners testified to the contrary and—what is more important—their testimony is supported by the documentary evidence, i.e., the contract of transportation of April 6 and the terms of the endorsement. And this oral and documentary evidence is reinforced by the undisputed fact that on April 29 —after the execution of the transportation contract giving Flores the exclusive privilege of transporting employees and the endorsement of April 27 covering such transportation— the buses involved herein were actually engaged in transporting such employees.

We have not overlooked the argument that it is unlikely that Flores would have permitted any bus to remain indefinitely as a part of his transportation line unless the owner of the bus agreed within a reasonable time to reimburse him for the additional premium involved in placing such a bus under the endorsement of Flores' policy. Undoubtedly Flores would have had to settle that problem with the individual owners shortly after April 27. But that question never came up because the three vital events—the effective date of the contract of transportation, the "hiring" of automobiles for use in carrying out the contract, and the accident— were virtually telescoped in point of time. The insurance

company cannot be permitted to reap a windfull because of that unusual turn of events. The contract of transportation having gone into effect on April 27, and the Guzmán and Contreras buses having been used to carry out its terms, the said buses were after-acquired cars within the meaning of the automatic coverage clause under the circumstances of this case.

The other contentions with reference to the automatic coverage clause need little additional consideration. The argument that Flores did not comply with paragraph (b) of the clause which requires that all automobiles of the assured be insured by the company is not tenable. We find nothing in the record which satisfies us that Flores either owed or acquired or hired for use for his transportation line any other cars which were not insured by the appellant. *Cf. Home Mut. Ins. Co.* v. *Rose,* 150 F. 2d 201 (C.C.A. 8, 1945) ; *Mitcham* v. *Travelers Indemnity Co.,* 127 F. 2d 27 (C.C.A. 4, 1942) ; Annotation, 127 A.L.R. 486.

■ The next point the appellant makes is that the plaintiffs can exert only such rights as Flores might have under the endorsement and that Flores is estopped from claiming coverage. This contention is based on the testimony of the insurance company's representative and of Flores that shortly before the endorsement of April 27 Flores advised the former that he did not wish to include any of the other individual owners under the endorsement of his policy as they were unwilling to reimburse him for the premiums therefor. For reasons already indicated, we reject this testimony in view of all the circumstances of this case. This contention therefore falls of its own weight as the testimony on which it is based is not accepted by us.

The appellant also argues that the method of operating Flores' transportation line under the third and final phase as described above did not constitute renting or hiring automobiles for use as required by the automatic coverage clause.

We see no purpose in examining the authorities cited by the appellant as to what constitutes "hiring". We have already seen that the appellant, both before and after the accident, was perfectly familiar with the nature of the operations of this bus line. It cannot now be heard to say that the language on which it agreed to cover the situation technically means something else. We think that under the peculiar circumstances of this case it is not unreasonable to interpret the arrangement which Flores had with the individual owners as one involving "hiring" their automobiles for use to transport employees to the base within the meaning of the automatic coverage clause.

The other errors assigned by the appellant are either already sufficiently covered by what has been said or are too trivial to warrant discussion. We add only that we find no basis for saying that the lower court abused its discretion in awarding $5,000 for attorney's fees. However, under all the circumstances, we do not deem it advisable to grant the request of the appellees for additional attorney's fees in this Court.

The judgment of the district court will be affirmed.