ST. PAUL MERCURY INSURANCE COMPANY, a corporation, Plaintiff,

v.

PENNSYLVANIA LUMBERMEN'S MUTUAL INSURANCE COMPANY, a corporation, Eusebio Gallardo, Varndell Gallardo, John W. Carn, Andrew Carn, and Feliciano D. Garcia, individually and as Administrator of the Estate of John Delano Garcia, deceased, Defendants.

State Farm Mutual Automobile Insurance Company, a corporation, Intervener.

Civ. A. No. 8609.

United States District Court
D. South Carolina,
Charleston Division.

Aug. 31, 1966.

Edward D. Buckley, of Bailey & Buckley, Charleston, S. C., for plaintiff.

Moore, Mouzon & McGee, Charleston, S. C., for defendant, Pennsylvania Lumbermen's Mut. Ins. Co.

Donald B. Barkowitz, Charleston, S. C., for defendant, Feliciano D. Garcia individually and as Adm. of Estate of John Delano Garcia, decd.

William H. Vaughan, Jr., of Grimball & Cabaniss, Charleston, S. C., for intervener.

HEMPHILL, District Judge.

St. Paul Mercury Insurance Company, plaintiff, sues for a declaration of rights in respect of a policy of liability automobile insurance issued by defendant Pennsylvania Lumbermen's Mutual Insurance Company to defendant Eusebio Gallardo which was in force and effect on January 31, 1964 when a 1957 Chevrolet which was allegedly insured under the policy was involved in an accident while being driven by defendant Varndell Gallardo, a minor son of the named insured.

On that evening Varndell Gallardo, with Andrew Carn and John Delano Garcia and two other men as passengers in the 1957 Chevrolet ran into a tree. Carn was injured in the accident. He was insured by St. Paul Mercury with the uninsured motorist provision. He instituted actions against Varndell Gallardo in the South Carolina courts and served his insurer St. Paul Mercury[1] on the theory that the 1957 Chevrolet was an uninsured vehicle under the laws of South Carolina[2] and as defined by the policy. Pennsylvania Lumbermen's was notified of the accident, Carn's claim, and the suit. They denied coverage and declined to defend. St. Paul Mercury has since negotiated a settlement of Carn's claim

---

[1]. S.C. Code Ann. § 46–750.33 (Supp.1965) in part: No action shall be brought under the uninsured motorist provision unless copies of the pleadings in the action establishing such liability are served in the manner provided by law upon the insurance carrier writing such uninsured motorist provision. The insurance carrier shall have the right to appear and defend in the name of the uninsured motorist in any action which may affect its liability * * *.

[2]. See S.C. Code Anno. § 46–750.31(3) (Supp.1965).

which has been conceded by Pennsylvania Lumbermen's to be a reasonable settlement.[3]

Garcia did not survive the injuries he sustained in the accident. His administrator brought actions in the South Carolina courts against Varndell Gallardo serving Garcia's insurer State Farm Mutual Automobile Insurance Company on the theory that the 1957 Chevrolet was an uninsured vehicle. Pennsylvania Lumbermen's was given notice of the accident, claim, and the actions. Coverage was denied and defense was declined. The wrongful death action was tried by jury and a verdict for the plaintiff was returned: appeal is now pending.[4]

St. Paul Mercury, plaintiff, the uninsured motorist carrier for Carn, and State Farm, intervenor, the uninsured motorist carrier for Garcia, seek a declaratory judgment determining that Pennsylvania Lumbermen's policy to Eusebio Gallardo covered the 1957 Chevrolet driven by Varndell Gallardo—that the Chevrolet was not an uninsured vehicle.

It is conceded that on the night of the accident there was in full force and effect a "family combination policy" issued to Eusebio Gallardo specifically insuring a 1953 Mercury automobile. The plaintiff asserts that this policy also insured the Chevrolet under the "automatic insurance" clause. The defendant maintains that the Chevrolet was (1) not an owned automobile within the meaning of the policy, and (2) that even if it were, the defendant Eusebio Gallardo specifically rejected coverage of the Chevrolet before the accident and cannot now claim the benefit of coverage. An "owned" automobile as defined by the policy is "a private passenger, farm or utility automobile *ownership* of which is *acquired by the name insured* during the policy period."

Varndell, the son, was at the time an eighteen year old construction worker who lived with the family in his father's home. Eusebio, the father, apparently lead a relatively inactive life during these times and his wife carried quite a measure of familial responsibility. They owned the Mercury automobile named in the St. Paul Mercury policy and they operated it to a somewhat limited extent because it was in need of some repair. Vince, the older brother of Varndell, owned an older 1954 Chevrolet, which Varndell had use of. There is testimony that Varndell had the 1954 Chevrolet transferred and registered in his name with the South Carolina Highway Department but on the records of the financing company they let Vince's name remain as the owner.

In 1963 Varndell's driver's license was suspended for excessive points under the system of the State but he continued to use the 1954 Chevrolet. Because the 1954 Chevrolet did not have the quality he desired and did not have the speed capability he desired in an automobile, Varndell decided to purchase a 1957 Chevrolet that had caught his eye on the used car lot of George Wannamaker. Wannamaker testified that he told the boys Vince and Varndell that he could not sell the automobile in the name of any one under twenty-one. Perhaps confusing the two boys in some manner he wrote up a sales order, however, and Varndell signed the order as the purchaser. A day or two after the tentative arrangements had been made Eusebio went to the car lot with Varndell and agreed that the car should be purchased and put in his name. The father then signed a conditional sales contract for the financing company and signed the South Carolina Highway Department forms requesting registration. The papers were in time issued to the father.

The 1954 Chevrolet which was then registered in Varndell's name was traded in on the 1957 Chevrolet as the down payment or a portion of it. Varndell paid the highway department registration fee and a $20.00 uninsured motorists fee. After the Gallardos took possession of the automobile some of the monthly pay-

3. Agreed Statement of Facts.

4. Agreed Statement of Facts. The appeal will not present any of the issues before this court.

ments were paid by Varndell and some were paid for by his father. The family's testimony indicates that they regarded it as Varndell's car but his mother testified that she was the one that was the principal user of the car and that she did so without having to ask permission of her son. It is to be understood that at this time Varndell did have his driving privileges suspended and that the mother did some driving for him. She testified that the title was in the father's name not only because the son could not finance the car but because he was underage.

 If the automobile was owned by the father it would be insured under the Pennsylvania Lumbermen's policy as an acquired vehicle during the terms of the policy. If the automobile was in fact owned by the son it would then be an uninsured vehicle. South Carolina provides by statute that "[a] certificate of title issued by the Department is prima facie evidence of the facts appearing on it." [5] Therefore there is at least prima facie ownership of the auto in Eusebio Gallardo as record title holder. The presumption of ownership evidenced by the certificate of title may be overcome by evidence that another is the true owner. Grain Dealers Mut. Ins. Co. v. Julian, 247 S.C. 89, 145 S.E.2d 685 (1965); Bankers Ins. Co. of Pa. v. Griffin, 244 S.C. 552, 137 S.E.2d 785, 787 (1964).

In Bankers Ins. Co. of Pa. v. Griffin, supra, true ownership was found in one other than the title holder on the following facts: Merdy Griffin was unable to buy the auto he desired because his credit was unsatisfactory and he could not obtain financing. His brother Henry had satisfactory credit and it was arranged for Henry to sign the note and mortgage to accommodate his brother. During the processing of the sale, apparently, Henry's name appeared on the vehicle registration and the certificate of title. The judge found that neither Merdy nor Henry realized that the vehicle would be registered in Henry's name as they apparently were of the impression that Henry would merely act as a co-signer or endorser of the note and mortgage.

In Grain Dealers Mut. Ins. Co. v. Julian [6] ownership was again found in one other than the title holder. Julian purchased the automobile on installment payments giving a chattel mortgage in which he named himself as sole owner. He took only an out of date registration paper and a bill of sale. All the payments were completed by him, and control of the car was maintained solely by him. He was held to be the owner of the vehicle notwithstanding he had never obtained a certificate of title.

In Booth v. American Cas. Co. [7] the question was whether the insured under a non-owners policy "owned" the auto he was driving thus precluding coverage under the policy. The insured under a non-owners policy through the assigned risk plan had his operator's license suspended due to traffic violations. He had no right to drive an automobile or to obtain license plates. He nevertheless purchased an automobile in his sister's name and obtained license plates for it. It was held he was the actual owner.

██ In both *Griffin* and *Julian* no evidence was offered by the title holder to substantiate his ownership. Henry Griffin was unaware that title was being recorded in his name. In *Julian* the registered owner executed and delivered a bill of sale to Julian who was held to be the true owner. In this case there is more than prima facie evidence of ownership in Eusebio Gallardo. The father took certificate of title and registered the car in his name because the son was unable to secure financing and because the son was underage. The mother was the principal user of the automobile and she assumed to exert control over the use of the automobile. She assumed responsibility for the automobile: she—not Varndell—arranged to make the necessary inquiries regarding insurance for the auto-

5. S.C. Code Ann. § 46–150.11 (1962).

6. 247 S.C. 89, 145 S.E.2d 685 (1965).

7. 261 F.2d 389 (4th Cir. 1958).

mobile. The father made actual payments on the automobile and he, indisputably, was accountable for all the payments on the automobile to the financer, as well as property taxes on the automobile to the taxing county. Under the authorities recited and the preponderance of the evidence Eusebio Gallardo was the owner in fact as well as the owner of record.

The fact that the son in this case was a minor living in the father's household further militates toward the conclusion reached. The case of Porter v. Hardee, 241 S.C. 474, 129 S.E.2d 131 (1963), decided before *Griffin* and *Julian*, involved the question in a different context on different facts and it does not control here. The court there held that the family purpose doctrine did not apply in a situation where the vehicle was registered in the name of the father and where the minor son had income of his own, purchased the car with his own money, had exclusive use of the vehicle and control of the vehicle, and was responsible for the maintenance of the vehicle. The sole reason for not registering the vehicle in the son's name was his minority. The question whether the automobile was one furnished, owned and maintained by the head of the family for general use, pleasure, and convenience of the family was answered in the negative. 129 S.E.2d at 132.

The case of Robinson v. Georgia Cas. & Sur. Co., 235 S.C. 178, 110 S.E.2d 255 (1959), another earlier case advanced by both parties is readily distinguishable from these facts and is of little help. When the father and an adult son each owned policies on a car owned by the father, a replacement automobile did not come within the son's policy because it did not replace an automobile owned by *him*. The son had merely an unrestricted right to use the automobile; that the

father owned the insured automobile was found by the trial judge (and adopted by the Supreme Court per curiam) to be apparently undisputed.

The defendant sets forth a second defense: that even if the auto was an owned one within the terms of the policy coverage yet was not effected because the defendants Eusebio and Varndell Gallardo stated to the authorized agent of Pennsylvania Lumbermen's that they did not desire insurance for the 1957 Chevrolet for the reason the premiums were considered too high.

 Mrs. Gallardo expressly told the agency that she did not want insurance because the premiums were too high. Mr. Gallardo was fully cognizant of this occurrence. Mrs. Gallardo continued to shop for insurance after this. Varndell Gallardo paid to the Highway Department the uninsured motorist fee. Eusebio Gallardo certified to the Highway Department that the auto was uninsured. Although the policy provided for automatic insurance throughout the policy period it is clear that the insurance coverage was declined by the insured before the accident occurred. Between defendants Eusebio and Varndell Gallardo and defendant Pennsylvania Lumbermen's there was no understanding by either party that there was to be insurance over the 1957 Chevrolet. This understanding was clearly expressed between Mrs. Gallardo and the agent of the insurer. It is true that automatic insurance for additional automobiles under the usual thirty day notice provisions effects coverage throughout the notice period.[8] In this instance the notice period is "during the policy".

 The fact that the acquired automobile is insured automatically for the notice period does not mean that one cannot refuse the coverage at an earlier

---

8. Where the accident has occurred during the notice period but before notice the courts have found that coverage was afforded by the automatic transfer during the notice period. See Inland Mut. Ins. Co. v. Stallings, 263 F.2d 852 (4th Cir. 1959); Western Cas. & Sur. Co. v. Lund, 234 F.2d 916 (10th Cir. 1956); Hoffman v. Illinois Nat. Cas. Co., 159 F.2d 564 (7th Cir. 1947); Annot., 34 A.L.R.2d 936, 943–945 § 7 (1954).

time because he does not wish to pay for it. The policy as written does not promise that coverage will be provided on after acquired automobiles during the notice period for the original consideration. The purpose of the provision is for the convenience of both parties, to provide continuous coverage of a party during a period of trade or acquisition, Home Mut. Ins. Co. of Iowa v. Rose, 150 F.2d 201 (8th Cir. 1945); Maryland Cas. Co. v. Toney, 178 Va. 196, 16 S.E.2d 340 (1941), but after the notice provision has been complied with premiums for coverage are to be assessed, Merchants Mut. Cas. Co. v. Lambert, 90 N.H. 507, 11 A.2d 361, 127 A.L.R. 483 (1940) (payment of an adjusted premium even in the case of a "replacement" though no condition precedent to automatic insurance is, implicitly, inevitable); Cf. Ash-Grove Lime & Portland Cement Co. v. Southern Sur. Co., 225 Mo.App. 712, 39 S.W.2d 434 (1931) (notice provision intended to protect insurer in collecting additional premiums). When the Gallardo family notified the agent that they did not desire to purchase insurance on the 1957 Chevrolet they clearly rejected coverage and were no longer liable to pay any premium for it. That they may have been unaware there was an automatic insurance feature cannot alter the result. They were fully aware that insurance was available but they rejected it as an unattractive bargain.

For the reason that coverage for the 1957 Chevrolet was declined by the insured before the occurrence of the accident it is adjudged that the Pennsyvania Lumbermen's policy did not cover the 1957 Chevrolet and therefore Pennsylvania Lumbermen's Mutual Insurance Company is not liable to defend actions nor respond to judgments arising out of the accident.

The Clerk will enter judgment accordingly.

And it is so ordered.