H. C. FLEMING, Jr., Mrs. Zed L. White, Mrs. Zed L. White, as Administratrix of the Estate of Zed L. White, Deceased, Mrs. Zed L. White, as Administratrix of the Estate of Francis White, Deceased, Henry C. Fleming, Sr., as Administrator of the Estate of Dorothy T. Fleming; Benjamin Joseph White, Anne Marie White, Zed L. White, Jr., Julia Elizabeth White, Edward William McG. White, James Robert White, and Emily Agnes White, Appellants,

v.

NATIONWIDE MUTUAL INSURANCE COMPANY, Appellee.

No. 10939.

United States Court of Appeals Fourth Circuit.

Argued March 8, 1967.

Decided Sept. 13, 1967.

Burnet R. Maybank and Robert A. Patterson, Charleston, S. C. (Maybank & Manucy and Barnwell, Whaley, Stevenson & Patterson, Charleston, S. C., on the brief), for appellant.

Joseph H. McGee, Jr., Charleston, S. C. (Moore, Mouzon & McGee, Charleston, S. C., on the brief), for appellee.

Before WINTER and CRAVEN, Circuit Judges, and HARVEY, District Judge.

HARVEY, District Judge:

Nationwide Mutual Insurance Company ("Nationwide") brought this declaratory judgment action to determine whether it was liable under an automobile liability insurance policy issued to Henry C. Fleming, Jr. ("Fleming"). The District court entered judgment for Nationwide, and defendants have appealed. We affirm.

In October of 1962, Fleming, a resident of Sumter, South Carolina, moved to Mt. Pleasant, South Carolina, and began the operation of a television repair business. At the time of such move, he owned a 1954 Pontiac automobile which he had bought in 1961. As a part of his new

business, he had acquired a second vehicle, a 1953 Ford Truck which he later traded toward the purchase of a 1962 Ford one-half ton panel van. On October 16, 1963, Nationwide issued Fleming its automobile liability policy No. 61–810–360, which covered the 1962 Ford van for the twelve month period beginning with the date of issue. An endorsement indicated that the intended use of the vehicle was commercial.

At the time such policy was issued, the 1954 Pontiac automobile, which had previously been covered by an earlier Nationwide policy, was not in running condition and was not insured nor licensed for 1963–1964. Although the Ford van was used primarily in the television business, Fleming from time to time used it for personal purposes.

On March 16, 1964, Fleming traded in his 1954 Pontiac as partial payment toward the purchase of a 1960 Pontiac passenger automobile. As he was experiencing business and financial difficulties, he was at the time of such purchase making efforts to sell his television repair business, including the 1962 Ford van. However, it was not until April 25, 1964 that such business was sold to W. T. Wilkins ("Wilkins") who agreed to pay the purchase price in several installments and further to make two past due payments on a chattel mortgage on the 1962 Ford van held by a finance company. Fleming delivered the Ford van to Wilkins but retained legal title until some date in May when the vehicle was repossessed and title was surrendered to the finance company.[1]

Between March 16 and April 25, 1964, Fleming continued to carry on his business and continued to use the Ford van. At the time of the purchase of the 1960 Pontiac he filled out and sent to the South Carolina Highway Department, as required by the South Carolina law, a form certifying that this automobile was covered by Nationwide's policy No. 61–810–360. Records of this Department indicate that a photostatic copy of this certificate was sent to Nationwide on May 14, 1964. Nationwide has no record of ever receiving such copy, nor do the Highway Department records show any acknowledgement of receipt from Nationwide. No notice was ever given Nationwide by Fleming of his purchase of the 1960 Pontiac nor of his disposition of the 1962 Ford van.

On August 30, 1964, Fleming was driving his 1960 Pontiac on U. S. Route 17 in Mt. Pleasant, South Carolina, when he collided with an automobile driven by Zed L. White. As a result of such collision, three people were killed and others injured. At the time of the district court's decision, personal injury and death actions were pending against Fleming in the Court of Common Pleas for Charleston County. Fleming contends that Nationwide is obligated under the terms of the automobile liability policy here involved to defend these suits and to pay all sums that Fleming becomes legally obligated to pay because the 1960 Pontiac replaced the 1962 Ford van within the meaning of certain provisions of such policy and because in any event Nationwide, under the facts here present, waived its rights and is now estopped from denying coverage.

Pertinent portions of Policy No. 61–810–360 are as follows:

"(a) Automobile. Except with respect to insurance under division 2 of Coverage G [having to do with medical payments] and except where stated to the contrary, the word 'automobile' means:

\* \* \* \* \* \*

"(4) Newly Acquired Automobile— an automobile, ownership of which is acquired by the Named Insured or his spouse if a resident of the same household, if (i) it replaces an automobile owned by either and covered by this policy, or the Company insures all

---

1. On June 23, 1964, after Wilkins had paid the past due installments, title was transferred by the finance company to Mrs. Wilkins. On June 24, 1964, a new insurance policy was issued by State Farm Mutual Insurance Company on the Ford van with Mrs. Wilkins named as owner.

automobiles owned by the Named Insured and such spouse on the date of its delivery, and (ii) the Named Insured or such spouse notifies the Company within thirty days following such delivery date; but such notice is not required under coverage E, F and division 1 of coverage G [having to do with property damages and personal injury liability and medical payments] if the newly acquired automobile replaces an owned automobile covered by this policy."

The policy also contains the following "Use of Automobile" endorsement:

"It is understood and agreed that the automobile is used as indicated * *.

D. Commercial—Including wholesale and retail delivery."

In this diversity action, South Carolina law controls the determination whether the 1960 Pontiac automobile was a replacement for the 1962 Ford van under these policy provisions. The parties agree that only one reported South Carolina case has construed a similar policy provision, but that case involves somewhat different facts. In Miller v. Stuyvesant Insurance Co., 242 S.C. 322, 130 S.E.2d 913 (1963), the insured and his wife owned a 1950 Ford, which was covered by an insurance policy providing coverage for a newly acquired replacement vehicle even in the absence of notice. Thereafter, the insured purchased a 1955 Chevrolet and when it was involved in an accident during the policy period, claimed coverage since he had theretofore transferred the 1950 Ford into his wife's name. The court held that there was no replacement under these circumstances because the 1950 Ford remained in the possession and ownership of Miller or his spouse who was a resident of the same household during the entire policy period.

In Mitcham v. Travelers Indemnity Co., 127 F.2d 27 (4th Cir. 1942), this Court had occasion to consider a case arising in North Carolina under somewhat similar facts as are here involved. The insured in that case owned both a Buick, insured by Travelers Indemnity

Company, and a Ford which was insured through another company. The Ford was traded in as part payment for a Lincoln, and the same day that the Lincoln was purchased the insured delivered his Buick to the same dealer to be sold. Before the Buick could be sold, the Lincoln was involved in an accident. Under a policy similar to the one here in suit this Court held that the Lincoln was not covered because it did not replace the Buick. The Court said the following at page 29:

"The purpose of the insurer to cover only one car is correctly set out in this argument, but the factual situation does not support the appellant's contention. The evidence supports the finding of the District Judge that the Lincoln Zephyr did not in fact replace the Buick car. Gray still retained title to the Buick and full control over it. At any time he could have taken it from the custody of the Motor Company and put it into use; at any time the Motor Company was privileged to use the car on Gray's behalf in order to demonstrate it to a customer; and in either case it would have been impossible for the company to show that the car was not still covered by the policy if an accident had occurred and liability on Gray's part had ensued."

In State Farm Mutual Automobile Insurance Company v. Shaffer, 250 N.C. 45, 108 S.E.2d 49 (1959), the Supreme Court of North Carolina defined a "replacement vehicle" under a similar policy as follows:

" * * * the replacement vehicle is one the ownership of which has been acquired after the issuance of the policy and during the policy period, and it must replace the car described in the policy, which must be disposed of or be incapable of further service at the time of the replacement."

Other courts have likewise stated the rule as requiring that the vehicle being replaced must be disposed of or be incapable of further service at the time of replacement if coverage is to be afforded. Yenowine v. State Farm Mutual Automobile Ins. Co., 342 F.2d 957 (6th Cir. 1965); Kelly v. State Farm Mutual Auto

Ins. Co., 256 F.Supp. 978 (E.D.Tenn. 1966); Lynam v. Employers Liability Assurance Corp., 218 F.Supp. 383 (D.Del. 1963).

The insured here relies on authorities which state that the fact that the vehicle described in the policy was retained by the insured in a legally useable condition does not preclude transfer of coverage to the newly acquired automobile where the evidence discloses that the new car was in fact purchased to replace the old one. Merchants Mutual Casualty Co. v. Lambert, 90 N.H. 507, 11 A.2d 361, 127 A.L.R. 483 (1940); Maryland Indemnity and Fire Ins. Exchange v. Steers, 221 Md. 380, 157 A.2d 803 (1960); Maryland Casualty Co. v. Toney, 178 Va. 196, 165 S.E.2d 340 (1941); 7 Am.Jur.2d Automobile Insurance § 101; Ann. 34 A.L.R. 2d 936, 945 (1954). However, the cases cited in support of this proposition involve factual circumstances indicating that the retained vehicle was physically or legally inoperable at the time that the new vehicle was acquired. As Judge Soper said in *Mitcham*, supra, after reciting the facts set forth hereinabove, at page 29 of that opinion:

> "These circumstances distinguish the case from Merchants Mutual Casualty Co. v. Lambert, 90 N.H. 507, 11 A.2d 361, 127 A.L.R. 483, upon which the appellant mainly relies, for in that case, although the old car covered by the policy remained in the insured's garage, with license plates attached, after the purchase of the new car, it had not been used by the insured for several months prior thereto, because it was worn out, out of repair, and not fit to be driven on the public highway. It was upon these facts that the court held that a transfer of insurance took place under the replacement clause despite the retention of ownership and possession of the old automobile by the insured."

In a decision applying the principles of the *Merchants* case, the Court of Appeals of Maryland said the following in the *Maryland Indemnity* case, supra, 221 Md. at page 388, 157 A.2d at page 808:

> "The *Mitcham* case distinguished this case [*Merchants*] on the ground that in *Mitcham* the named automobile was still operable. The factual difference between the present case and *Mitcham* is even greater than that between *Merchants* and *Mitcham,* for in this case the original car was not only physically, but also legally, inoperable at the time when the Ford was acquired as a replacement. In these circumstances, we regard the *Merchants* case as strongly in point."

█ When Fleming purchased the 1960 Pontiac and yet continued to use the 1962 Ford van, clearly while he owned both vehicles the Ford van was covered by the policy, and the Pontiac was not. Fleming's counsel have so conceded. However, at the time of the purchase of the 1960 Pontiac, Fleming represented to the South Carolina Highway Department that such Pontiac was covered by this policy. He now takes the position that on April 25, 1964, when the Ford van was delivered to Wilkins, the Pontiac *then* became a replacement for the Ford van, even though the Pontiac had been purchased some six weeks earlier and used together with the Ford during the intervening period.[2] We do not agree.

█ We have been referred to no case holding that an insured may own and operate both the replaced and the replacing vehicle for more than a month and then elect without notice to his insurer to have the replacement occur when he disposes of the older vehicle. In our opinion, the courts of South Carolina would not so hold if this question were presented to them. Nor do the facts here present indicate that the 1960 Pontiac, a pleasure car, was intended to replace the Ford van,

2. Nationwide urges that Fleming owned both vehicles until some date in May when title to the Ford van was transferred to the finance company. Fleming claims that the date of delivery to Wil-

kins controls. Whether the period involved was approximately six weeks or was eight weeks or longer is immaterial for the purposes of this case.

a commercial vehicle. After acquiring the television repair business in 1961, Fleming owned at the same time both a pleasure automobile (a 1954 Pontiac) and a commercial vehicle (at first a 1953 Ford truck and later a 1962 Ford van). The 1954 Pontiac was the vehicle traded as part payment for the 1960 Pontiac. The pleasure car was purchased in March and immediately used, but it was not until April that the commercial vehicle, covered by this policy containing a commercial endorsement, was sold together with Fleming's television repair business.

We are not suggesting that in all instances the old vehicle must have been disposed of or have been incapable of further service before the new one can become a true replacement. Under other circumstances than those here present, temporary retention of the old vehicle for a short period of time might not negate an otherwise clear intention that the newly acquired vehicle was to be a replacement for the one covered by the insurance policy. However, here the retention and use of a commercial vehicle for almost six weeks after purchase of a pleasure car indicates that the latter was not in the absence of notice in fact a replacement for the former under the terms of a policy covering the commercial vehicle.

Fleming further argues that Nationwide waived its rights and is estopped to deny coverage because it took no steps to cancel the policy following Fleming's notice of coverage sent to the South Carolina Highway Department and later mailed to Nationwide. It is not disputed that Fleming gave no notice directly to Nationwide. The form sent to the Highway Department was required by the South Carolina Uninsured Motorist Law.[3] Fleming now concedes that such notice imparted false information since the policy here did not cover the 1960 Pontiac on March 16, 1964. On May 14, 1964, the Highway Department mailed a copy of the form to Nationwide, but Nationwide's records do not disclose that this form was ever received.

■■ On the basis of such facts, the district court found that the insurer had received no notice or knowledge of a newly acquired automobile to be covered by the policy. We cannot say that this finding was clearly erroneous. Absent such notice or knowledge, the insurer had no reason to assume that coverage extended to any vehicle other than the one specifically named in the policy. Under such circumstances, the insurer is not estopped from denying coverage at some later date.

Affirmed.

CRAVEN, Circuit Judge (dissenting):

The court's decision seems to me an unjustifiably narrow interpretation of the replacement clause in an automobile liability insurance policy. To be sure, ordinarily the change of possession and ownership of the "old" for the "new" car occurs at or about the time of delivery of the new automobile. One is substituted for the other. When the usual occurs, there is no problem and ordinarily no litigation. Preoccupied with the usual fact situation, the court reads the policy provision as if it contained words specifying *the time when replacement must occur*. It does not.[1] One need only look at the language of the policy (words chosen presumably by the insurer and not the assured) to clearly perceive that "replacement," within the meaning of the policy, may occur in at least these two fact situations:

(a) Simultaneous, or virtually simultaneous, exchange of one vehicle for another;

(b) Purchase of a "new" vehicle and subsequent abandonment or sale of the "old" vehicle.

In the latter situation there arises, of course, during the interim, the problem of protecting the insurance company against

---

3. § 46–137, Code of Laws of South Carolina (1962, as amended).

1. See opinion of the court, supra, p. 147, quoting the section of the policy being construed.

the risk of double coverage, i. e., the risk that the owner may take the position that whichever vehicle is in collision bears the insurance. That there may be a problem does not justify the court's rewriting the insurance policy in order to avoid it. And here there is no such problem for the simple reason that the collision did not occur until long after the "old" vehicle had been sold to a new owner. This is not in dispute: it is agreed that the new purchaser of the "old" vehicle had even taken out liability insurance with another company.

Thus, the court is not faced with the necessity of guarding, as it should, an insurance company from double risk for a single premium. There was no double risk, or to be more precise, the risk of double coverage ended when the "old" vehicle was sold—long before the collision. At the time of the collision, the assured owned one and only one vehicle. That it was a Pontiac passenger vehicle instead of a business type Ford van would seem to have diminished rather than increased the risk. The premium had been accepted. Statutory notice (Form 402) had been sent by the Highway Department to the insurer advising that the assured claimed coverage on the "new" vehicle.

The court's perplexing decision cannot be explained on the ground that, inequitable or not, it is compelled by state court decisions. The only South Carolina case cited by the majority does not require, if indeed it even supports, such a result. In Miller v. Stuyvesant Ins. Co., 242 S.C. 322, 130 S.E.2d 913 (1963), upon purchase of the alleged replacement car by the named insured, title to the original car was transferred into the assured's wife's name. The policy defined an *insured* as "named insured and his spouse if a resident of the same household." Replacement vehicle was defined to be "an automobile, ownership of which is ac-

quired by the named insured or his spouse if a resident of the same household if * * * it replaces an automobile owned by either and covered by this policy." In view of these policy terms, the South Carolina Supreme Court quite understandably held that there was no replacement because the original car remained in the possession and ownership of "the named insured or his spouse, who was a resident of the same household." A decision that there was *no* replacement is scarcely authority for rewriting the policy to specify *when* replacement must occur.

In Mitcham v. Travelers Indem. Co., 127 F.2d 27 (4th Cir. 1942), on which the court also relies, the accident occurred *before* the original vehicle was sold. Unlike *Miller* and *Mitcham*, the insured in the instant case did not have ownership or possession of the replaced vehicle at the time of the collision.

Where there is no danger of an insurance company being saddled with *double* coverage, I think it unjust to permit it to escape *single* coverage. The innocent collision victims are third party beneficiaries of automobile liability insurance and are entitled to protection where (a) the premium has been paid, (b) the risk is not increased, and (c) the insurance company is not subjected to the danger of double coverage. The universal rule, frequently confirmed by the South Carolina Supreme Court, that terms of an insurance contract should be construed most liberally in favor of the insured should be invoked in the instant case to afford the assured coverage. See, e. g., Glisson v. State Farm Mut. Auto. Ins. Co., 246 S.C. 76, 142 S.E.2d 447, 449 (1965). At the very least, the policy ought not be amended by the court to insert words of limitation that are simply not there.

I dissent.